# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IEX CORPORATION | § | |
| | § | |
| V. | § | CASE NO. 4:01CV16 |
| | § | (Judge Brown/Judge Bush) |
| | § | |
| BLUE PUMPKIN SOFTWARE, INC. | § | |

## ORDER

Defendant Blue Pumpkin seeks to exclude Plaintiff IEX's expert, Debbie May's testimony concerning a reasonable royalty for alleged infringement of IEX's patent, ( hereinafter referred to the "355 patent"). May is vice president and general manager of IEX. The Court notes that her resume addresses her experience in management and development of systems, but is silent as to her financial background. In her report, she states that she has been involved in the negotiation of intellectual property licenses (as distinguished from royalty licenses) as well as contracts and agreements related to IEX's financial issues. Nothing else references her familiarity with royalties. It is May's opinion that a 20% royalty rate would have been set for sales of Blue Pumpkin's infringing products had a license agreement been entered into by the parties.

Blue Pumpkin's position is that May fails to meet the threshold test for rendering an opinion under Federal Rule of Evidence 702 and the United States Supreme Court opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Blue Pumpkin argues that the Court should exclude May's testimony and opinion as to royalty on three grounds. First, she lacks the requisite experience and background to offer testimony on a reasonable royalty rate. Second, she lacks sufficient information to offer a reliable opinion . Third, her analysis is faulty in arriving at a reasonable royalty rate.

IEX, of course, takes exception to Blue Pumpkin's position. IEX contends that the Court has

already approved May as an expert witness and therefore Blue Pumpkin, by not previously objecting to such designation, has waived any objection.  On June 10, 2002, U.S. Magistrate Judge Robert Faulkner approved May as an expert witness.  IEX designated May on several grounds including testimony on the amount of a reasonable royalty.  Two other witnesses were also designated on this subject matter.  The Court heard oral argument on Blue Pumpkin's motion.

The Court is not prevented from reviewing the challenge to May's testimony.  First, there was no expert report tendered at the time of the designation.  The Court views the designation as a preliminary disclosure by the parties of potential witnesses and the areas of testimony.  Second, May was designated in a number of areas. The designations are general and merely provide the adverse party with a road map of expected testimony. Third, to argue that, once qualified, the witness' report or testimony need not comport with sound evidentiary principles undermines the Court's role as a "gatekeeper."[1]  Under the circumstances and considering the rationale for the Court's requirement as to the preliminary designation of expert witnesses, the Court finds that Blue Pumpkin is not estopped from objecting to May's testimony.

IEX seeks damages for the alleged infringement of its '355 patent. First, IEX seeks lost profits on sales it could have made but for Blue Pumpkin's competition in the market place. To do this, it relies on the opinion of Keith Ugone. Blue Pumpkin does not challenge Ugone's analysis as to lost profits. IEX also seeks a reasonable royalty on sales for which lost profits cannot be established.[2]

---

[1]The Court notes that IEX appears to recognize the Court's inherent power to revisit the issue herein and  devotes little argument to the contrary.

[2]Ugone analyzes and then performs a market share adjustment to determine what IEX share would have been absent Blue Pumpkin. Considering the adjusted market share compared to Blue Pumpkin's  total revenues adjusted for IEX's incremental costs of selling its product,  Ugone determines that lost profits exceed 8 million dollars. To the remaining revenues for which lost sales have

A reasonable royalty calculation envisions and ascertains the results of a hypothetical negotiation between the patentee and the infringer at a time before the infringing activity began. *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). Thus, the reasonable royalty calculus assesses the relevant market as it would have developed before and absent the infringing activity. Although an exercise in approximation, this analysis must be based on "sound economic and factual predicates." *Riles,* 298 F.3d at 1349 (citing *Crystal Semiconductor Corp. v. TriTech* (Fed.*Microelectronics Int'l, Inc.,* 246 F.3d 1336 Cir.2001); *Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed.Cir.2001)). Royalties, like lost profits, are compensatory damages, not punitive. *See Riles,* 298 F.3d at 1312.

The Federal Circuit has stated that although the damages calculation after a finding of infringement involves "an element of approximation and uncertainty," a "reasonable royalty" will be held valid as long as the award is supported by substantial evidence, is not grossly excessive, and is not based "*only on speculation and guesswork."* Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1385 (Fed.Cir.2001).

Blue Pumpkin's position is that May's opinion is nothing more than mere speculation and guesswork. A reasonable royalty is defined as "damages adequate to compensate for infringement." The patent statute sets the reasonable royalty rate as a floor, not a ceiling to damages. 35 U.S.C. § 284 ("but in no event less than a reasonable royalty"); *and Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 538, 1554 (Fed.Cir.1995). The reasonable royalty calculation may be used when the patentee is unable to prove lost profits. If the record is devoid of evidence fixing the "established royalty" in the

---

```
not been demonstrated, he uses May's opinion of 20% as a reasonable royalty rate
and calculates damages for a reasonable royalty in excess of six million
dollars.
```

3

field, then the fact finder may determine the reasonable royalty based on "hypothetical negotiations" between the patentee and infringer. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1579 (Fed.Cir.1996). Courts caution, however, that when the two parties were not willing or able to come to an amicable resolution, other factors must be analyzed to avoid the "perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't lose course." *Fromson v. Western Litho Plate & Supply Co.* 852 F.3d 1568, 1575 (Fed. Cir. 1988). A detailed list of all pertinent factors used to determine a reasonable royalty has been set out in *Georgia-Pacific Corp. v. United States Plywood Corp.,* as follows:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
>
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
>
> 7. The duration of the patent and the term of the license.
>
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that

had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention-would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970); *see also Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109 (Fed. Cir. 1996).

Blue Pumpkin contends that May does nothing more than pay lip service to the guidelines noted above and that her methodology for arriving at a reasonable royalty rate is flawed and erroneous. Blue Pumpkin challenges May's qualifications and opinions in part on the ground that she has never negotiated a patent license before. Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B).

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or

5

evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise....·" The party offering the expert testimony has the burden of proving admissibility. *See Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786 (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589-590, 113 S.Ct. 2786. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92, 113 S.Ct. 2786. In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93, 113 S.Ct. 2786. As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir.1999). A party can only elicit expert testimony from someone who has specialized knowledge or training sufficient to qualify him or her to opine on an issue within their field of expertise, and the expert's opinion must be confined to that field. *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir.1997). *Daubert*'s "gatekeeping" obligation as to relevance and reliability extends to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Blue Pumpkin argues that May's lack of patent experience prevents her from testifying. Lack of experience and knowledge regarding reasonable royalties may very well disqualify a witness. *See*

6

*State Contracting and Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057,1073 (Fed. Cir. 2003). Uncertainty as to facts or data or methodology may also disqualify a witness from testifying as to a reasonable royalty. *Minebea Co., Ltd. v. Papst*, 2005 WL 1459704 (D. D.C. 2005). When an expert opinion is based on data, methodology , or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony. *See Amorgianos v. Nat'l R.R. Passenger Corp.* 303 F.3d 256, 266 (2d Cir.2002). Expert testimony is inadmissible if only "connected to existing data by the ipse dixit of the expert." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). However, other cases also hold that mere faulty methodology is the subject of cross-examination and not exclusion. *See Eolas Technologies, Inc. V. Microsoft Corp.*, 270 F. Supp. 2d 997 (N.D. Ill. 2003). In the end analysis, the methodology used to assess damages for patent infringement rests within the discretion of the Court. *Oxford Gene Technology, Ltd. V. Mergen Ltd.*, 345 F. Supp. 2d 431, D. Del. 2004). Mere recitation of the Georgia Pacific factors will not survive a challenge if the methodology is unreliable or it is unclear what facts or data have been relied upon by the expert. *Minebea Co., Ltd. v. Papst*, 2005 WL 1459704 (D.D.C. 2005).

Blue Pumpkin offers considerable criticism of May in that she does not have the expertise to render an opinion on damages as to royalty. The Court finds that her lack of experience in negotiating royalty licenses, or even reviewing patent licenses is not a singular ground for disqualification, but should be considered in light of her approach to the methodology applied in this case. Blue Pumpkin also attacks her methodology in that she fails to consider Blue Pumpkin's anticipated profit in determining a reasonable royalty. However, the law does not require that an infringer be permitted to make a profit, where a patentee is unwilling to grant an unlimited license. *See Monsanto Co. v. Ralph*, 382 F 3d 1374 (2004). The Georgia Pacific factors for determining a

reasonable royalty are not exclusive. *Pioneer Hi-Bred International, Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135 (N.D..Iowa 2003), and must be viewed with some flexibility. *Applera Corp. v. MJ Research Inc.*, 389 F.Supp.2d 344 (D.Conn. 2005). Royalties in some cases may exceed the infringer's profit. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1580 n.1 (Fed. Cir. 1996), and opinions which call in to question sound economic practice are factual matters for jury consideration. *Network Appliance, Inc. V. Bluearc Corp.*, 2005 WL 1530222 (N.D. Cal. 2005). As IEX points out, many cases interpret Rule 702 broadly or liberally in determining whether an expert witness should testify. Weinstein's Federal Evidence § 702.04[1][a], p. 702-46 (The standard for qualifying expert witnesses is liberal"); *see also Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998) ("Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact"); *Cary Oil Co., Inc. v. MG Refining Markketing, Inc.*, 2003 WL 1878246, at *1 (S.D.N.Y. April 11, 2003) *citing TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002) (Courts "have liberally construed expert qualification requirements when determining if a witness can be considered an expert"); *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Rule 702 is broadly interpreted"). The question presented here is whether someone with limited or little patent or finance background can be permitted to testify on matters which appear to be largely based on financial considerations.

      In reaching her opinion, May states that she has referred to a number of IEX documents. Some of the referenced documents are attached to Exhibit B of her report. However, many of the noted documents are not attached to her report which was furnished to the Court. For those attached, it appears that the documents pertain to expenses related to Total View product development. She also notes conversations with individuals including IEX salespersons, Chuck Anderton and Keith Ugone. However, her report is silent as to what conclusions and opinions of Ugone she relied upon

8

other than her blanket statement that "my opinions include by reference all the opinions and testimony referenced in Exhibit B." Since Ugone's report also includes financial data on Blue Pumpkin, the Court notes by the parties' agreement, May has no access to such financial data. Therefore, it is unlikely she has reviewed Ugone's report unless she did so in violation of the stipulated protective order agreed to by the parties and as ordered by the Court. Ugone states that he assisted May in rendering her ultimate conclusion on the royalty license fee. He states: " I provided Ms. May with an IEX's contribution to profit analysis. This analysis indicates the average contribution to profit IEX earned for additional TotalView sales (including product license fees, maintenance fees, training fees, installation fees, and hardware sales)." One of the revenue line items in the voluminous financial records attached to various reports is "Extended Warranties Revenue." Nowhere in Ugone's report is there any mention of the Extended Warranty Revenue feature noted on TotalView's financial statements. In fact, Ugone's analysis of lost profits and incremental costs due to increased sales of TotalView does not appear to address this line item. Additionally, his analysis as to lost revenue for training, installation and service revenues does not incorporate the extended warranty revenue line item. By footnote, he states that the analysis is illustrative only and assumes that lost revenues would be proportionally distributed across product license fees, *maintenance* revenues, and training and implementation revenues. In the royalty analysis of his report he does mention maintenance fees (but not service) in addition to hardware sales and determines that the contribution to profits of TotalView sales for 2000 was 66.7%. It appears that revenue from the line item noted as Extended Warranty was included in the original report on Exhibit 25. This is the exhibit that May notes in her report. However, no witness ever addresses what this item is in relation to other items. The Court cannot assume that the item is maintenance since that term appears to be used interchangeably with service throughout the various reports. In fact,

9

when Ugone "cross -checks" representations made by IEX personnel on their ability to produce and install additional software at the annual levels identified in his lost sales analysis, he only compares license fees and fees for training, implementation, and service. Neither witness specifically explains whether the income statements reflect actual income received or revenue recognized under the accrual method. Ugone only mentions this in passing at footnote 58 in his original report.

IEX requests that May be allowed to testify as to royalties. In addressing factor 6 under *Georgia-Pacific*, May states that the patented invention (skills based scheduling) is the key generator of TotalView sales. She also states that IEX offers support and maintenance for the product for which such revenue is tied directly to sales of TotalView. She states that this factor provides a significant upward bias on a negotiated rate for royalties. According to IEX's financial information, revenue is defined as initial product revenue, installation revenue, services revenue or extended warranty revenue.  As to Blue Pumpkin's revenue, Ugone divides revenue into four categories: licensing fees, maintenance revenues, training, implementation and service, and other miscellaneous revenues (primarily port-sales generated revenue).  Nowhere does May (or for that matter Ugone ) address IEX's extended warranty component specifically. Both witnesses use terms of maintenance, support, installation and product sales as revenue generators.  However, no witness appears to unqualifiedly state that the extended warranty component is part of the bundled sales considered as generating revenue or how that feature is comparable to one of the four Blue Pumpkin revenue categories noted by Ugone.  May, at page 10 of her report, states that her royalty rate would have been 20% of Blue Pumpkin sales of its product along with any revenue attributable to installation, maintenance or service associated with that product.  Her conclusion is based upon review of IEX's financial information as well as the information listed in Exhibit B. Even in May's report dealing with price erosion there is no reference to revenue from extended warranties. She only references

annual maintenance fees. Thus, the Court is left to guess or discern whether maintenance fees are the same as revenue from the category noted as extended warranty. This bears critical analysis in that roughly 50% of all revenue on TotalView is from the revenue listed as extended warranty. If extended warranty revenue is not part and parcel of TotalView sales, then all calculations, at least as to a reasonable royalty, are flawed. Given May's report, the Court cannot discern what methodology she has actually incorporated. The Court is left with an impression that May does not understand how the company accounts for revenue and this lack of understanding undermines her ability to render an opinion on what a reasonable royalty is for the patent at issue. She claims to have reviewed IEX's financial data in order to form her opinion regarding a reasonable royalty rate. In fact, she uses two charts generated by Ugone which incorporate revenue from extended warranty; yet, as mentioned, there is never a comment as to what the category includes. The Court can find no reference in Ugone's report or in May's report that extended warranty revenue is in fact maintenance revenue or even categorically similar to the maintenance categories noted for Blue Pumpkin.

After her consideration of the *Georgia-Pacific* standards, which the Court considers only a minimal effort, May reaches a conclusion that a reasonable royalty would be 20%. However, this appears to be tied to Ugone's analysis of additional sales of TotalView as a contribution to profit.[3] From the report it is certainly not clear how May opines on this number. It is only in her deposition that she provides some basis for her conclusion. In her deposition, May testified that she took IEX's

---

[3] To further confuse the issue, Ugone "cross-checks" his analysis of lost sales from Blue Pumpkin's revenue by comparing IEX's annual lost sales with IEX's actual TotalView related revenue. He does the comparison using licensing fees, fees for training and implementation, and service fees. No mention or comparison is made as to the extended warranty factor. Ugone's analysis of lost profits and maintenance revenues does not appear to include the extended warranty revenue factor. If this factor is important, the Court is left to guess why lost profit or sales do not include this factor, but revenue for royalties does.

contribution margin and divided that based on IEX's share of the market. She also stated that she took into account what a reasonable royalty rate would be for Blue Pumpkin to pay. However, she had no financial information as to Blue Pumpkin. She states that Ugone reinforced this opinion. Although Ugone appears to have looked at what he calls a contribution to profit analysis for Blue Pumpkin, it is not clear whether he ever determined what Blue Pumpkin's profits from sales were for its allegedly infringing product. Contribution to profits from sales is not the same as net profit. It appears that Ugone could have made this analysis with the information he had.

    May's "analysis" of the Georgia-Pacific factors is also deficient in addressing factors 12 through 15.  Her analysis of items 12 and 13 never addresses the portion of profit or selling price customary in the business to allow for the use of the invention.  As someone "skilled" in the business, May should have some opinion based on her represented experience.  Likewise, she fails to address 13 in any respect.  The shortcomings in her analysis of the Georgia-Pacific factors lie in her failure to address the financial considerations mandated.

    The Court finds that, under the totality of the circumstances, when considering her lack of financial expertise, her minimal consideration of the *Georgia-Pacific* factors, her failure to specifically identify what factors underline her opinion and her reliance on experts who also do not sufficiently identify factors that May took into consideration in arriving at her opinion, May's testimony as to a reasonable royalty should be excluded as unreliable.

    **SIGNED this 14th day of December, 2005.**

                                     */s/ Don D. Bush*
                                     DON D. BUSH
                                     UNITED STATES MAGISTRATE JUDGE