

**United States District Court**
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IEX CORPORATION | § | |
| | § | |
| V. | § | CASE NO. 4:01CV16 |
| | § | (Judge Brown/Judge Bush) |
| | § | |
| BLUE PUMPKIN SOFTWARE, INC. | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Blue Pumpkin Software, Inc. ("Blue Pumpkin") has filed a Motion for Summary Judgment of Non-infringement. IEX Corporation ("IEX") has accused Blue Pumpkin of infringing United States Patent No. 6,044,355 (the "'355 patent"). The opinion of the Federal Circuit on IEX's appeal provides a good starting point for this discussion. As stated in the Federal Circuit's opinion:

> IEX is the holder of the '355 patent, entitled "Skills-Based Scheduling for Telephone Call Centers." A telephone call center is a collection of agents, telecommunications equipment, and management software, organized for the sole purpose of handling customer contact through telephone calls. As calls are received, they are identified by an automatic distributor ("ACD") according to type (*e.g.* sales calls, service calls) and are either delivered to a waiting agent or are queued pending agent availability. In a typical "queue/team" model, agents are divided into teams, with each team handling a particular call type. If the ACD receives a sales call, for example, that call is directed to the sales call team and is either taken immediately by a sales call agent or is queued until one becomes available. Because agents within a particular team are interchangeable for purposes of handling calls, teams are scheduled independently.
>
> Skills-based routing systems depart from the "queue/team" model in that each incoming call is determined to require a particular skill or number of skills (*e.g.* sales experience, service experience) and is directed by the ACD to an agent with the required skill set. Teams are no longer formed around a specific call type, but are instead comprised of agents having a particular skill set. An agent with both sales and service experience, for example, is not limited to a sales call team or a service call team, but instead may be connected to both sales and service queues. Likewise, an agent with sales and billing experience may be connected to the sales and billing queues....

> The invention of the '355 patent is designed to simplify the scheduling process within a skills-based environment. The patent claims an iterative approach to "generating agent schedules for a telephone call center operation based on the 'skill' profiles of the agent population."….
>
> [T]he invention generates staffing data that generally defines the total number of additional agents needed to handle a call type during a particular time interval.…The invention also generates skills group availability data, which is a percentage estimate of the number of agents available to handle a call type during a particular time interval.…Using these numbers, the invention utilizes a commercially available "scheduler" to generate an agent work schedule.…The invention then runs to a call handling simulation on the schedule based on a call distribution algorithm and historic call data.  If variables such as the average speed of answer, the number of calls abandoned by the caller and the idle time logged for each agent, fall below pre-determined expectations, the invention adjusts the net staffing data and skills group availability data, and uses the modified values to create a new schedule.…The method repeats the iteration until it reaches the desired scheduling results.…
>
> IEX sued Blue Pumpkin on January 12, 2001, claiming that two Blue Pumpkin products--Director Essential and Director Enterprise–infringed the '355 patent.

Federal Circuit Opinion, 2-4.

The Federal Circuit remanded this case on IEX's appeal, holding that the district court erred in relying on an incorrect claim construction and granting Blue Pumpkin's Original Motion for Summary Judgment.  The Federal Circuit also held that the district court did not fully articulate its reasons for rejecting IEX's expert evidence, particularly that from Mr. McAlexander.  The parties disagree as to what the Federal Circuit held in remanding the case.  However, this Court does not believe the opinion is ambiguous and enters this report guided by the reasoning of the Federal Circuit.

## **Standard**

Summary Judgment is proper if, after drawing all reasonable factual inferences in favor of the non-moving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," FED. R. CIV. P. 56(c). Summary Judgment is not proper when "the evidence is such that a reasonable jury could return a verdict for the non-moving party.

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then the fact-finder compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent in the accused device." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001); *see also Johnson Worlwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999). The Federal Circuit has provided the claims analysis. Therefore, the only issue is whether applying the construction as determined by the Federal Circuit, there remains a fact issue for resolution on infringement.

## Analysis

At oral argument, Blue Pumpkin contended that the issue of non-infringement could be decided on the basis of Joseph McAlexander's testimony. It is Blue Pumpkin's position that McAlexander's testimony conclusively demonstrates that Blue Pumpkin is correct in its assertions that its products do not infringe the '355 patent.

The parties have spent a great deal of time accusing each other of "hiding the ball" and changing theories of the case. Blue Pumpkin also contends that McAlexander has submitted a sworn declaration that is contradictory to his previous testimony. This is nothing more than a credibility issue which the Court is not permitted to consider on a Motion for Summary Judgment.

3

*Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1361 (Fed. Cir. 1998).  IEX also accuses Blue Pumpkin of not being candid in its position that the two products, Essential and Enterprise, now use substantially different codes.  As stated, much of the briefs, replies and sur-replies devote as much argument to the parties' lack of candor as to infringement.  Over the course of several years, McAlexander has given several depositions, reports and declarations. The Federal Circuit has directed that the Court consider whether, after a review of such evidence, any fact issue remains as to infringement.

In his deposition of October 3, 2005, McAlexander identifies at least one respective step in each of the Essential and Enterprise codes that correspond to the respective steps of the asserted claims.  He also stated that he identified in the Essential code instances in which one or the other of several code functions correspond to a claim element and gives examples.  In his supplemental report he identifies the variable "m_dError Score" which correlates to Blue Pumpkin's "net staffing data" generated according to the claims of the '355 patent.  He states that for each interval and call type, Enterprise code generates the "m_dErrorScore" estimate each time it calls the "ErrorScore()" method.  He states that another feature of the Enterprise code is "GETStaffingFTEDiffs(voids)," which is net staffing data. In his second supplemental report he identifies the attribute "m-dStaffingFTE" as skills group availability data.  He states in his declaration of November 9, 2005 that if there is no literal infringement as to element (a) of claim 1, then there is infringement under the doctrine of equivalents.  Paragraph 8 of his report sets forth his rationale for this conclusion.  In paragraph 9 he identifies several codes which practice element (c) of claim 1.  He also states that if there is no literal infringement, infringement is still shown by the doctrine of equivalents.  This information is set forth in paragraph 10 of his most recent declaration.  He also addresses Blue Pumpkin's source code, which he claims infringes

element (e) of claim 1. Again in paragraph 13 he states that if there is no literal infringement, then infringement is found under the doctrine of equivalents, and he gives his rationale for such opinion. He also states that the Enterprise code satisfies a finding of infringement for each of the '355 patent claim elements even in view of the limitation imposed by the Federal Circuit that the claimed "skills group availability data remain constant in a given iteration until after a generation of a schedule." He goes on to state that a schedule is generated once a modification is made to it and each modification made by adding or removing an agent results in a new schedule being generated. He also states that the "m_d MergeFactor" is also "skill group availability data" according to element (b) of claim 1. Blue Pumpkin has raised quite a "fuss" over this opinion, claiming that this has never been disclosed before and that McAlexander's testimony in this regard is a change in position to get around the Federal Circuit's claim construction on the requirement that skill group availability data remain constant until a generation of a schedule. Blue Pumpkin claims that McAlexander had previously stated that this factor was not a component of skill group availability data and without this testimony there can be no literal infringement since under element (b) the requirement as to constancy in Blue Pumpkin's code would be absent. Again, he opines that absent literal infringement there would be infringement under the doctrine of equivalents as to element (b). He goes on to state that Blue Pumpkin's source code does not preclude adding agents to the schedule such that "skills group availability data" for a given call type and interval is held constant in a given iteration until after all sequential generations of schedules between simulations are completed.

Blue Pumpkin argues that, compared to the '355 patent, its products implement a fundamentally different design strategy. Rather than implementing an allegedly simpler scheduling algorithm that maintains performance measurement values constant until scheduling

5

is complete, Blue Pumpkin constantly modifies its MDSFTE and MDCG parameters to more accurately reflect the current performance of the schedule in each calculation. Through this design strategy, Blue Pumpkin believes that it achieves higher accuracy in its scheduling calculations resulting in faster convergence on an acceptable schedule and vastly reduced use of the simulator. At oral argument, Blue Pumpkin represented that its system is actually less efficient than that of IEX.

IEX states that Blue Pumpkin "steers clear" from discussing the components that comprise the above named variables. IEX contends that the MergeFactor variable, which influences the value of both MDCG and MDFTE, does not change as modifications are made to the schedule. Only Upperbound and Lowerbound components change. These components reflect the cumulative total of agents in a skill group. Both Essential and Enterprise use MergeFactor, which represents the percentage of time agents in the skill group spend on a call type, to refine the cumulative contribution that is represented by Upperbound and Lowerbound. IEX contends that because MergeFactor stays constant even as agents are added and removed from the schedule, Blue Pumpkin's assertion that its skill group availability data does not remain constant is "technically incorrect."

Even if Blue Pumpkin is correct in its assertion that there is no literal infringement, McAlexander states that there is infringement based on the doctrine of equivalents. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Werner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). "Because infringement under the doctrine of equivalents often presents difficult factual determinations, a

6

summary conclusion that a reasonable jury could not find infringement is often illusive." *Id.* at 1359 (citing *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1372 (Fed. Cir. 2001); *Ethicon Endo-Surgery v. United States Surgical Corp.*, 149 F.3d 1309, 1320-21 (Fed. Cir. 1998)). After all reasonable inferences are made in favor of the nonmovant, if a reasonable jury could find that any differences between a missing claim element and the corresponding aspect of the accused product are insubstantial, a court should deny a motion for summary judgment of non-infringement. *Id.* at 1358-60. After considering the summary judgment evidence, including the November 9, 2005 declaration of McAlexander, as well as the argument and briefs of the parties, the Court finds that there is a fact issue as to infringement and recommends that Blue Pumpkin's Motion be denied.

## RECOMMENDATION

Based upon the foregoing, the Court recommends that Blue Pumpkin's Motion for Summary Judgment of Non-infringement be DENIED.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 14th day of December, 2005.**

                                                DON D. BUSH
                                                UNITED STATES MAGISTRATE JUDGE